DEC-08-2003  12:25    Gerald B. Lefcourt, P.C.                      P.02/10

# UNITED STATES DISTRICT COURT
## Southern District of New York

UNITED STATES OF AMERICA

v.

GLEN B. LAKEN

**AMENDED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:    1: S4 00 Cr. 00632 - 17 (WHP)
                1: 00 Cr. 00651 - 01 (WHP)

Gerald B. Lefcourt, Esq., Gary G. Becker, Esq.
Defendant's Attorney

Date of Original Judgment: 09/04/2003
(Or Date of Last Amended Judgment)

**Reason for Amendment:**

☐ Correction of Sentence on Remand (Fed. R. Crim. P. 35(a))

☐ Reduction of Sentence for Changed Circumstances (Fed. R. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(c))

☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P.

☐ Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))

☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S. § 3582(c)(1))

☐ Modifications of Imposed Term of Imprisonment for Retroactive to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant   ☐ 28 U.S.C. § 2255,
   ☐ 18 U.S.C. § 3559(c)(7),   x  Modification of Restitution Order

**THE DEFENDANT:**

xx  pleaded guilty to count(s)  1 of case number 1: 00 Cr 00651 - 01 (WHP)

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

xx  was found guilty on count(s)  2,9,10,11,12,13,14 of case number 1: S4 00 Cr. 00632 - 17 (WHP)
after a plea of not guilty.

| Title & Section | Nature of Offense | Date Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC 1962(d) | Racketeering Conspiracy | 06/14/2000 | 2 |
| 18 USC 371 | Conspiracy to commit union pension fund fraud and kickback conspiracy | 06/14/2000 | 9 |
| 18 USC 1343, 1346 and 2 | Wire Fraud | 03/02/2000 | 10 |
| 18 USC 1954 and 2 | Payment of illegal kickbacks | 06/14/2000 | 11 |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

xx  Count(s) _____underlying and open_____  ☐ is  x  are dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec.    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

Defendant's Date of    02/20/1954

Defendant's USM No.:    12999-424

Defendant's Residence Address:

41 Scott Loop

Highland Park, Illinois 60035

09/03/2003
Date of Imposition of Judgment

_(signature)_
Signature of Judicial Officer

William H. Pauley III, United States District Judge
Name and Title of Judicial Officer

12/02/03
Date

Defendant's Mailing Address:

same as above



RECEIVED
DEC X ? 2003

GERALD B. LEFCOURT, P.C.

PLAINTIFF'S
EXHIBIT
1

DEC-08-2003  12:25       Gerald B. Lefcourt, P.C.                    P.04/10
Sheet 2 — Imprisonment                                  (NOTE: Identify Changes with Asterisks (*))

Judgment — Page __2__ of __3__

DEFENDANT:        Glen B. Laken
CASE NUMBER:      1: S4 00 Cr. 00632 - 17 (WHP), 1: 00 Cr. 00651 - 01 (WHP)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of __63 MONTHS__ .

The sentences on Count 2 of S4 00 Cr. 632 (WHP), which carries a statutory maximum of twenty (20) years, is sixty-three (63) months. The sentences on Counts 9,10,12 and 13 of S4 00 Cr. 632 (WHP), and Count 1 of 00 Cr. 651 - 01 (WHP), each of which carries a statutory maximum of five (5) years, is sixty (60) months. The sentences on Counts 11 and 14 of S4 00 Cr. 632 (WHP), which carry a statutory maximum of three (3) years, is thirty-six (36) months. The sentences on all counts shall run concurrently with each other.

xx    The court makes the following recommendations to the Bureau of Prisons:

    1. The defendant be designated to Eglin Camp at Eglin Air Force Base.
    2. The defendant participate in the Bureau of Prisons intensive alcohol treatment program.

☐    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at _____    ☐ a.m.  ☐ p.m.    on _____
    ☐    as notified by the United States Marshal.

xx    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    x    before 2 p.m. on  __01/29/2004__  .
    ☐    as notified by the United States Marshal.
    x    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____
_____
_____

Defendant delivered on _____ to _____
at _____ , with a certified copy of this judgment.

UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

DEC-08-2003  12:26        Gerald B. Lefcourt, P.C.                    P.06/18

Judgment—Page ___5___ of ___8___

DEFENDANT:      Glen B. Laken
CASE NUMBER:    1: S4 00 Cr. 00632 - 17 (WHP), 1: 00 Cr. 00651 - 01 (WHP)

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall provide the probation officer with access to any requested financial information.

2. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

3. The defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may include urine testing at the direction and discretion of the probation officer.

4. The defendant shall report to the nearest Probation Office within 72 hours of release from custody.

5. The defendant shall be supervised by the district of residence.

DEC-08-2003  12:27      Gerald B. Lefcourt, P.C.                          P.08/10

Judgment—Page    7    of    8

DEFENDANT:      Glen B. Laken
CASE NUMBER:    1: S4 00 Cr. 00632 - 17 (WHP), 1: 00 Cr. 00651 - 01 (WHP)

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

1. The defendant shall pay a fine of $12,500.00 by October 3, 2003.

2. The fine shall be sent to the Clerk of the Court, Southern District of New York , 500 Pearl Street, New York, NY 10007, Att: Cashier's Office.

3. It is ordered that the defendant make restitution in the amount of $6,620,675.33, to the Clerk, U.S. District Court, for disbursement to the various investors listed in the attached victim list, (government exhibit 105 attached) except that no further payment shall be required after the sum of the amounts actually paid by all defendants has fully covered the compensable injury. The compensable injury for each individual investor is equal to the amount associated with that investor in Government Exhibit 105 less 10%, for a total of $6,620,675.33.

4. The restitution shall be paid in monthly installments of 20% of gross monthly income over a period of supervision to commence 30 days after the defendant is released from custody.

5. The defendant shall notify the United States Attorney for the district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

DEC-08-2003  12:27      Gerald B. Lefcourt, P.C.                                    P.10/10

DEFENDANT:       Glen B. Laken
CASE NUMBER:     1: S4 00 Cr. 00632 - 17 (WHP), 1: 00 Cr. 00651 - 01 (WHP)

Judgment — Page ___1___ of ___1___

## STATEMENT OF REASONS

☐ The court adopts the factual findings and guideline application in the presentence report.

**OR**

x   The court adopts the factual finding and guideline application in the presentence report except (see attachment, if necessary):

   (see transcript)

## Guideline Range Determined by the Court:

Total Offense Level: __26__

Criminal History Category: __I__

Imprisonment Range: _____63_____ to _____78_____ months

Supervised Release Range: _____2_____ to _____3_____ years

Fine Range: $ __12,500.00__ to $ __125,000.00__

☐ Fine waived or below the guideline range because of inability to pay.

Total Amount of Restitution: $ __6,620,675.33__

☐ Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(d).

☐ For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

☐ Partial restitution is ordered for the following reason(s):


☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

**OR**

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reasons:


**OR**

☐ The sentence departs from the guideline range:

   ☐ upon motion of the government, as a result of defendant's substantial assistance.

   ☐ for the following specific reason(s):


AO 245C    (6/99) Amended Judgment on a Criminal Case
Sheet 6 — Reverse — Statement of Reasons                          (NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___ of ___

DEFENDANT: _____

TOTAL P.10

30013/RNK



Chris J. Stanton
Chief
U.S. Probation Officer

Mark Rosenthal
Deputy Chief
U.S. Probation Officer

Cheryl L. Holmes
Deputy Chief
U.S. Probation Officer

Steven C. Foronato
Deputy Chief
U.S. Probation Officer

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### PROBATION OFFICE

New York, NY
April 19, 2004

C. Tureaud, Case Manager
Federal Bureau of Prisons
Federal Correctional Complex
846 NE 54th Terrace
P.O. Box 1021
Coleman, Florida 33521-1021

Re: Glen Laken, #12999-424

Dear Ms. Tureaud:

This letter serves as a response to your correspondence, dated March 31, 2004, to which a "cop out" from Glen Laken was attached. In this "cop out," Glen Laken challenged the "accuracy" of the information contained in his presentence investigation report. Our response addresses the three specific "challenges" to the presentence report outlined by Mr. Laken in his "cop out."

- "The Bureau of Prisons has noted in its data base and files that I am an associate of the Colombo/Bonnano LCN, otherwise known as organized crime or mafia;"

Upon review of the presentence investigation report, we determined that there was no information provided which should have been interpreted as Mr. Laken being an "associate" of an organized crime family. Please compare paragraph 99, which provides a brief synopsis of the defendant's involvement in the instant offense, with other similar paragraphs. For example, see paragraphs 83-87 and 91-95, in which defendants are listed as "soldiers" or "associates" of organized crime families. Paragraph 99 which relates to the defendant, intentionally omits these characterizations. While the instant offense involved associates of organized crime families, we have no information to indicate that Mr. Laken was an "associate" of the Bonnano or Colombo Crime Family.

Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-
1312
212.805.0040
212.805.0047 - Fax

United States Courthouse
300 Quarropas Street
White Plains, NY 10601-
1901
914.390.4040
917.390.4055 - Fax

128 Dolson Avenue
Middletown, NY 10940-
6435
845.344.2789
845.344.2722 - Fax

15 Governor Drive
Newburgh, NY 12550-
8338
845.567.1302
845.567.9153 - Fax



PLAINTIFF'S
EXHIBIT
2

– "The Bureau of Prisons has noted in its data base and files that I was charged with Conspiracy to solicit the murder of a confidential informant;"

Paragraph 112 contains information about Cary Cimino soliciting the murder of a cooperating witness. We have no information that Mr. Laken was involved in this offense and Mr. Laken's name is not listed in the presentence report in connection with the conspiracy to solicit the murder of a confidential informant. In addition, Mr. Laken was never charged with the conspiracy to solicit the murder of a confidential informant. This information was included in the presentence report to provide an overview of a co-defendant's conduct. We regret if there was any misinterpretation on behalf of the Federal Bureau of Prisons.

– "The Bureau of Prisons has noted in its data base and files that the acts or attempted acts or references to violence in the charged offense were attributable to me or at the very least foreseeable by me during the course of the charged conspiracy."

The joint venture between the Bonanno and Colombo Crime Family and their subsequent infiltration into the securities industry encompassed extortion, threats and intimidation to further their illegal activities. We have no information, however, that Glen Laken was involved in any acts of extortion, threats, or intimidation. In addition, we have no information that the defendant was involved in the obstruction of justice. Nor do we believe that these acts were foreseeable to the defendant during the course of the charged conspiracy. A brief synopsis of the defendant's offense with respect to S4 00 CR 632 (please see paragraphs 99 and 106 - 110) is as follows: Glen Laken operated the Trade Venture Fund and sought investors for this fund. Laken was involved in a scheme to pay secret kickbacks to individuals who would then find investments through union pension funds. We have no information that the defendant was involved in any acts of violence or attempted violence in relation to this offense.

Yours truly,

*Ross Kapitansky*

Ross Kapitansky
U.S. Probation Officer
212-805-5165

Approved:

*Kathleen Coad*

Kathleen Coad
Supervising U.S. Probation Officer
212-805-5180

# Joel A. Sickler
**Criminologist**

*Justice Policy Solutions, P.C.*
4312 City Lights Drive
Aliso Viejo, California 92656
(949) 305-0001-direct
(949) 305-0002-facsimile

Wednesday, June 2, 2004

Via Facsimile & Federal Express                    Confidential & Time Sensitive

Raymond Holt
Regional Director
Southeast Regional Office
U.S. Bureau of Prisons
3800 Camp Creek Parkway, S.W.
Building 2000
Atlanta, Georgia 30331-6226

Re:    Laken, Glen B., Reg. No. 12999-424
       (Pending Transfer from FCI Coleman-Low)

Dear Mr. Holt:

Ordinarily, I would not ask your office to intercede on behalf of a client inmate, however, I firmly believe that Mr. Laken's case requires your review. I have communicated directly the regional administrator for designation, Kathy Lane, and found her explanation concerning Inmate Laken's pending transfer to be contrary to Bureau policy and in some respects, blatantly arbitrary.

Allow me to quickly summarize the facts: Mr. Laken was sentenced in the Southern District of New York to a term of 63-months imprisonment. He was designated to a Low security facility due to confusion over the description of his offense in the Presentence Report (PSR). It was thought that Laken had ties to organized crime and participated in offense behavior necessitating imprisonment in a controlled environment.[1] After the probation office in the

---

[1] Laken's central file falsely noted that he was an organized crime "associate" and had participated in a conspiracy to solicit murder. Neither allegation is true and both allegations were specifically addressed in a letter to Laken's case manager by Ross Kapitansky, U.S. Probation Officer, Southern District of New York (212/805-5165), attached hereto. Laken, 50, is a non-violent offender with



Raymond Holt, Director
June 2, 2004
Page 2

Southern District of New York issued an unequivocal clarification to the Bureau of Prisons,
Laken's unit team at FCI Coleman recommended him for transfer to a minimum security camp.
Ms. Lane's office, having received the transfer referral from FCI Coleman, assigned Mr. Laken
to the minimum security camp at Atlanta, Georgia.

Yesterday, I sent a letter to Ms. Lane stating that while we were pleased that Mr. Laken's central
file was corrected and that he was deemed minimum security (his classification is "minimum-
out"), we are deeply concerned that he is being sent to a facility that ignores two key aspects of
his confinement: Laken's sentencing judge specifically recommended him for placement at FPC
Eglin so that he could avail himself of the RDAP and, importantly, so that he would be housed
with other observant Jews and be permitted access to Kosher diet, Sabbath services and other
faith-based opportunities. The federal prison camp at Atlanta does not house an RDAP and will
necessitate yet another transfer for Mr. Laken in a short period when it is time for him to apply
for the program (he can technically apply for RDAP in March 2005). Additionally, FPC Atlanta
has very few inmates of the Jewish faith (if they have any at all). According to Rabbi Menachem
Katz, Director, Prison Programs, Aleph Institute, a *minyan* for Friday Sabbath services has
never occurred at the Atlanta camp and kosher diet, if available, must be brought over from the
USP (and according to Rabbi Katz, is "not a good situation").[2]

I spoke to Ms. Lane about Mr. Laken today. Her response, while professional, was troubling.
She believes, and, I must paraphrase here, that "although the probation office cleared up the
questions we had about the inmate's offense conduct, he doesn't deserve to go anywhere other
than a satellite camp and is lucky he is being moved at all. I'd be happy to leave him at Coleman.
There were too many allegations in the Presentence Report that bother me. It's a gut feeling."

I took exception with the designators analysis and questioned how she could apply a "gut"-
based assessment to a case in the face of having received a written explanation of the charges
from the United States Probation Officer who prepared the Presentence Report. Her answer, in
essence, was "because I can." She reiterated that "something wasn't right" and that her "gut"
dictated the transfer assignment decision.

Mr. Holt, your designation officials are professionals whom I have always found to be terrific at
what they do. Their jobs are difficult as they must manage the ebb and flow of a huge prison
population, no question. And, Ms. Lane is particular has always been the consummate

---

no prior criminal history who participated in a securities fraud.

[2]  As you know, The Aleph Institute, a not-for-profit 501 ©) (3) religious organization, stands
alone as the foremost agency in the world today, serving the spiritual needs of incarcerated Jews and their
families.

Raymond Holt, Director
June 2, 2004
Page 3

professional and a thorough administrator. But, in this instance, I firmly believe the analysis she is applying to Glen Laken's case is arbitrary and capricious. And, moreover, I searched your policies far and wide and have found nothing that requires placement of an inmate in a satellite camp if that inmate is perceived, subjectively or otherwise, to be a greater security risk due specifically to their offense conduct. I am fearful that the designations administrator is indiscriminately applying a nebulous, unwritten rule based on intuition alone. I can't imagine that an inmate can be sent to any facility because of an unfounded suspicion. The situation requires your oversight.

In sum, our client has been confined for nearly 3 months at a facility that was not suitable for his security level. He was sent to an FCI because the Bureau of Prisons incorrectly evaluated his presentence report and improperly labeled him as a greater security risk than he actually is. The court allowed voluntarily surrender, but Mr. Laken is now faced with a Marshals bus transport, in shackles, to a new facility, and, then, down-the-road, he will have to be moved again, to a third facility-- if he is not reassigned to an RDAP camp at this juncture. This has been very difficult on a 50-year old first offender who, until three months ago had never experienced the degradations of incarceration. It seems that sound correctional policy (not to mention the economy of the bureau's resources) dictates that Glen Laken should be sent to a minimum security facility where he can finally settle in, adjust to his surroundings, practice his faith, volunteer for and complete the RDAP and finish his sentence without undo interruption.

I have recommended that Mr. Laken file an emergency BP 10 officially asking for you intervention. In addition, I will call you today to discuss this matter.

Thank you, sincerely, for your time and consideration.

Sincerely,

Joel A. Sickler

Enclosure



**U.S. Department of Justice**

Federal Bureau of Prisons

*Southeast Regional Office*

June 17, 2004

*Building 2000*
*3800 Camp Creek Parkway, S.W.*
*Atlanta, Georgia 30331-5099*

Joel A. Sickler, Criminologist
Justice Policy Solutions, P.C.
4312 City Lights Drive
Aliso Viejo, California 92656

Re:    Laken, Glen B.
         Reg. No. 12999-424

Dear Mr. Sickler:

This is in response to your letter of June 2, 2004, in which you question the decision to transfer Glen B. Laken to the Atlanta Satellite Camp located on the grounds of the United States Penitentiary in Atlanta, Georgia.  Specifically, you state the sentencing judge recommended a designation to the Federal Prison Camp in Eglin, Florida, so that inmate Laken could participate in the Residential Drug Abuse Program (RDAP) and be able to have more religious affiliations and services.  You express concerns that both of these expectations will not be met at the Atlanta Satellite Camp.

A review of the matter suggests the Federal Bureau of Prisons (Bureau) is in possession of a Presentence Investigation Report (PSI) which includes an extensive addendum discussing objections made to the PSI prior to his sentencing.  Additionally, the United States Probation Office (USPO) provided the Bureau a letter indicating the information in the PSI is accurate but has been misinterpreted by the Bureau.  In particular, the USPO recognizes inmate Laken's "instant offense involved associates of organized families" but states they have "no information, however, that Glen Laken was involved in any acts of extortion, threats, or intimidation" and indicates he does not "believe that these acts were foreseeable to the defendant."  The Bureau also consulted the Assistant United States Attorney assigned to the underlying criminal matter.  Through this contact, the Bureau learned inmate Laken has filed post-sentence requests for the court to modify his PSI or otherwise issue a statement to the Bureau indicating such for designation purposes.  The court appears to have considered the Assistant United States Attorney's position that the evidence at trial proved his knowing involvement with organized crime associates and the court declined to grant the requested relief.  Nevertheless, inmate Laken's Case Manager conducted a thorough review of his custody classification.  Based upon this review and her professional assessment of his security needs, a transfer to a minimum security facility was requested.  Upon review of this request, Regional staff concurred with the



Joel A. Sickler, Criminologist
June 17, 2004
Page 2

recommendation for re-designation to a secure minimum security facility. As such, inmate Laken has been re-designated to the Atlanta Satellite Camp.

The Bureau has issued national procedures which govern the provision of religious services to inmates of all faith groups at all facilities. Inmate Laken should work with the staff Chaplain to ensure his religious needs are met. Additionally, the Bureau welcomes religious volunteers from the community. Atlanta is a large city; thus, the opportunity for inmate Laken to receive pastoral visits and counseling from civilians in his faith group may be higher than at some of the Bureau's more rural facilities. Finally, inmate Laken's projected good conduct time release date is October 3, 2008. Thus, admittance into an RDAP program, if appropriate, is not imminent. Inmates are routinely designated to one institution, transferred for program participation to another, and then returned to their parent institution.

Inmate Laken was convicted of multiple counts for his role in a criminal conspiracy. The Bureau has properly considered the appropriate designation and re-designation of inmate Laken, and will continue to monitor the propriety of his placement throughout his incarceration.

I trust this information is responsive to your concerns.

Sincerely,

R. E. Holt
Regional Director

**BP 10  Laken, Glen, Reg. No. 12999-424, Case No. 337315-F1**

I appeal Warden Wright's denial of my BP-9 filed on June 7, 2004 and returned to me on July 14, 2004.[1]  I respectfully ask the Reg. Dir. to review Warden's Wright's denial of my request to be transferred to a camp near my home in Illinois.  My reasons for this request are: 1) to be placed in a camp that can accommodate my religious needs; 2) I have specific programming requirements and request placement in an RDAP facility; and, 3) I need to be closer to my family in Illinois. A directly-related issue that also requires review, is whether my designation to USP Atlanta-satellite camp was properly handled within the rules and regulations of P. S. 5100.07. I believe the decision to place me in a satellite camp was capricious and arbitrary. Atlanta satellite camp, by the Bureau's own admission, is a "secure" minimum security camp. My transfer to Atlanta was directed by the Reg. Designator who claimed that it was her "gut feeling" that I needed to be in a facility with enhanced security measures. The designator's assessment of my security needs was based on a misinterpretation of my Presentence Report (PSR) and her subjective, arbitrary judgment. My explanations are below.

Religious needs being denied— I am of the Jewish faith, I observe the Sabbath, eat a kosher diet and seek the opportunity for group worship in a *minyan* (requiring a group of 10 men). Atlanta satellite camp can not accommodate my needs as an observant Jew. The kosher diet is lacking in essential nutrients and the rabbi, present on one hour per week, does not engage in any meaningful pastoral counseling. Moreover, I am one of only three Jewish inmates on the compound and a *minyan* can not be obtained to properly observe the Sabbath. Without a *minyan*, no formal religious services or group worship opportunities are possible for me and the BOP is in violation of the Supreme Court's decision in O'Lone v. Estate of Shabazz as well as the Religious Freedom Restoration Act of 1993 (RFRA).

Programming requirements being unmet - While I am not within 36-months of release, I note that P.S. 5330.10 lists this criteria factor as a variable that is "ordinarily" considered when determining an inmate's eligibility to begin RDAP treatment. It does not specifically prevent an inmate from requesting an eligibility interview nor does it strictly prohibit an inmate from starting the program prior to the 36-month-from-release threshold. In light of the Supreme Court's ruling in Blakely v. Washington, I expect my sentence to be reduced within in the next several months. This sentence reduction will render me immediately eligible for RDAP participation. For that reason, I am requesting an early eligibility interview and transfer to a RDAP camp.

Facilitate Family Visits—I request transfer to an RDAP camp, preferably in the North Central Region, near my family in Chicago. I have a 71-year-old mother in failing health and a 19-year-old son residing in Chicago. My mother is too infirmed to travel to Georgia and my son, a university student, can not afford the time away from school to visit me in the Southeast.

Improper Security Issue—I was transferred to FPC Atlanta because it was deemed necessary for security reasons (see letter of Reg. Dir. Holt to my representative dated June 17, 2004 attached as Exhibit A). Due to a fundamental mis-reading of my Presentence Report, I have been selected for placement in a "secure" minimum security camp. As a consequence, my religious rights, and my institutional programming and family needs are being undermined, if not outright denied me. The decision to move me to a "secure" camp was based on a mis-interpretation and mis-reading of my PSR.[2]  It was further based on the reg. designator's subjective analysis. Decisions of this kind can not be made based on an administrator's intuition or "gut feeling"; **her decision was clearly arbitrary and capricious.**

---

[1] The denial was signed July 2, 2004 at FCC Coleman but not received my me in Atlanta until July 14th. An initial BP-10 was filed timely by my representative on August 3, 2004. That appeal was returned to my representative due a claimed technical filing error per P.S. 1330.13. At the Deputy Regional Counsel's invitation, the BP-10 is being resubmitted.

[2] If denied a transfer I will exhaust my administrative appeals and file suit under the Privacy Act. I have grounds to prove that the BOP willfully transferred me pursuant to inaccurate prison records citing the 11th Circuit Court of Appeals decision in Perry v. Bureau of Prisons (June 3, 2004) and Rose v. United States, 905 F 2d 1257, 1259 (9th Cir. 1990).


PLAINTIFF'S EXHIBIT 5

# Joel A. Sickler
## Criminologist

*Justice Policy Solutions, P.C.*
**4312 City Lights Drive
Aliso Viejo, California 92656
(949) 305-0001-direct
(949) 305-0002-facsimile**

Saturday, July 31, 2004

**Via Facsimile & Federal Express Priority Overnight
& Time Sensitive**

                                                              **Confidential**

Lisa Sunderman, Regional Counsel
Southeast Regional Office
U.S. Bureau of Prisons
3800 North Camp Creek Parkway, S.E.
Building 2000
Atlanta, Georgia 30331

Re:    Laken, Glenn B., Reg. No. 12999-424

Dear Ms. Sunderman:

As you are aware, my client, Glenn B. Laken, has filed an administrative remedy request (BP10), asking for that your office resolve an issue pertaining to his request to be transferred. The appeal was forwarded by my office via Federal Express for delivery July 29th [1]. As I indicated in a cover letter that accompanied his appeal, Mr. Laken's situation is quite serious and requires immediate intercession. Unfortunately, as the CFR limits an inmate's explanation to one page, much of Laken's argument in support of his appeal had to be omitted. As the CFR does not address the filing of additional materials to augment an inmate's administrative appeal, I respectfully ask that you please consider my letter and the information presented in support of Mr. Laken's BP10.

Please allow me to highlight some of the important issues his appeal covers, all of which relate to his placement at the satellite camp in Atlanta. During his confinement at FCC Coleman (Low), an institution he was improperly designated to when the Bureau misread his PSR and over-assessed his security level, Laken asked to be transferred to either FPC Eglin (where his sentencing judge recommended) or to FPC Yankton (to be closer to his family). Ultimately, his
Lisa Sunderman, Reg. Gen. Coun.
July 28, 2004
Page two

---

[1] Admin. Appeal Case No. 337315-F1.

unit team at Coleman requested the regional designator transfer him to Yankton. Coleman's warden seemingly signed off on this recommendation. After the designator refused to transfer Laken anywhere except the camp at Atlanta (claiming he needed to be confined in a "secure" camp), Laken filed a BP9 asking the warden to re-request Yankton for four reasons: Atlanta camp could not accommodate his Judaism and RDAP needs; his PSR was being mis-evaluated and he did not require any enhanced security measures; and, he wanted to be transferred closer to home to facilitate family visits. His BP9 was indeed prophetic, the Atlanta camp has not been able to provide for his religious or RDAP needs, his mother and son have been severely restricted in their ability to visit him in Atlanta, and based on Warden Wright's denial of his BP9 (and also based on a letter I received from Regional Director Holt)[2], the Bureau continues to misconstrue the facts surrounding his offense conduct. As a result, the Bureau has erroneously labeled Laken a greater security risk than he clearly is. On top of all of this, I had a disturbing conversation with the regional designator in which she commented that Laken was "lucky" to be going to a camp at all and that it was her "gut feeling" he deserved enhanced security. The reality is, Ms. Sunderman, Glen Laken is a garden variety white collar offender who was convicted of violating this country's securities laws. While the criminal conspiracy he was involved in did involve members of organized crime, Laken has nothing to do with these individuals and his role in the conspiracy was limited to certain financial improprieties, crimes that historically the Bureau has assessed as requiring minimum security.

## Why Laken Should be Transferred

**Religious Rights Suspended**— Laken observantly practices Judaism by adhering to the strictures of the Sabbath, eating a kosher diet and worshiping in a *minyan* (requiring a group of 10 men). Warden Wright noted in his BP9 denial that the Chaplain at USP Atlanta would be able to ensure Laken's "religious needs are met." In reality, however, the Atlanta camp's Rabbi visits once per week for approximately one hour and does not participate in services nor does he provide any meaningful pastoral counseling. There are only three Jewish inmates on the compound and a *minyan* can not be obtained to properly observe the Sabbath. Further, the kosher diet is lacking in essential nutrients and does not provide enough calories for basic survival. According to the Aleph Institute, kosher food for the Atlanta camp is prepared at the USP and is not prepared under the auspices of a qualified Rabbi. Laken was told that on Friday evenings he would be permitted access to the chapel wherein he would presumably be allowed to observe my faith. Without a *minyan*, formal religious services or group worship opportunities are impossible for him. He is left to pray alone with no other support. By contrast, I note that Christian services are officiated each Sunday by a pastor and the families of inmates are permitted to attend the service with their loved ones.

Lisa Sunderman, Reg. Gen. Coun.
July 28, 2004
Page three

A recent example of what is clearly disparate treatment occurred just this past weekend (July 23-24, 2004). Camp inmates were on a modified lock down. Laken was not permitted to go to the chapel on Friday evening, nor did he receive a kosher meal on Friday (only on Saturday did he receive his "common fare" consisting of beans and cottage cheese; on Sunday, he received a chicken patty). Tellingly, a Rastafarian festival was held on Friday, July 23rd, Muslim services were held over the weekend and a Christian service was held on Sunday, July 24th, in the chapel without any interruption due to the lock down.

---

[2] Director Holt's letter is dated June 17, 2004.

Given FPC Atlanta's inability to accommodate his religious needs, I agree with Laken that the BOP is in violation of the Supreme Court's decision in O'Lone v. Estate of Shabazz as well as the Religious Freedom Restoration Act of 1993 (RFRA). Religious activity can be limited by a warden only when "necessary for the security or good order of the institution..." DOJ/BOP P.S. 5360.08. O'Lone, later refined by the RFRA, requires a balancing test: while it is permissible for the BOP to restrict or impede an inmate's access to group worship, it can do so only if it provides more information than just a blanket security concern for the denial, such as past documented incidences of security threats or legitimate predictions of probable security and safety dangers. I submit that Laken does not present a security concern whatsoever. His security level is minimum and his custody classification level is "out." He was permitted to voluntarily surrender and in over four months of confinement, he has a clear conduct record. Furthermore, he was convicted of non-violent security fraud charges. Without a security override, the Bureau cannot possibly justify denying Laken his right to practice his religion under RFRA. The issue needs to be resolved by your office, quickly.

Programming requirements are also being unmet -Warden Wright dismissed Laken's BP9 request to be transferred to a camp that housed the RDAP by stating, "[your] admittance into RDAP, if appropriate, is not imminent."[3] While he is clearly not within 36-months of release, I note that P.S. 5330.10 lists this criteria factor as a variable that is "ordinarily" considered when determining an inmate's eligibility to begin RDAP treatment.[4] I submit the term "ordinarily" implies that exceptions can be made for cause and I believe Laken has exceptionally *good* cause: in light of the Supreme Court's ruling in Blakely v. Washington, his appellate attorneys fully expect his sentence to be dramatically reduced in the next several months. This sentence reduction will render him immediately eligible for RDAP participation. For that

Lisa Sunderman, Reg. Gen. Coun.
July 28, 2004
Page four

reason, he is requesting an early eligibility interview and transfer to an RDAP camp. The Supreme Court has accepted a cert petition on two federal sentencing guidelines cases (U.S. v. Fanfan, 1st Cir. & U.S. v. Booker, 7th Cir.). The court is expected to issue a clarifying opinion on Blakely no later than early October 2004. Shortly thereafter Laken's sentence will be reduced and he will be immediately eligible for RDAP treatment. If he remains in Atlanta camp, he will have to transferred to another institution to participate in the program. That undue delay will impact his eligibility range two ways. First, inmates with less than 24 months remaining to serve can not participate in the program, hence, Laken could be denied admission to the program all together. And, two, any delay could impact adversely his RDAP-incentive sentence reduction under 18 U.S.C. 3621 (e) (inmates who start the program past their 27-month out date lose time directly from their 3621 (e) reduction) . This is an issue affecting Laken's "liberty" and would be subject to a 2255 challenge. However, a transfer to an RDAP camp now, would resolve the issue.

Family Visits are being curtailed-Laken requests transfer to an RDAP camp, preferably in the

---

[3] Laken's Presentence Report (PSR) documents his history of alcohol/drug abuse. Additionally, he needs to participate in RDAP to develop a better understanding of his disease and learn the tools to help him stay sober upon my release from prison. The program was recommended by both the sentencing court and the U.S. Probation Officer who prepared his PSR.

[4] The policy does not appear to specifically prevent an inmate from requesting an eligibility interview nor does it strictly prohibit an inmate from starting the program prior to the 36-month-from-release threshold.

North Central Region, near his family in Chicago. He has a 73-year-old mother in fragile health and a 20-year-old son residing in Chicago. His mother is too frail to travel to Georgia with any frequency and his son, a university student, can not afford the time away from school to visit him in the Southeast.

While his sentencing judge recommended placement in the southeast, the reasons for that recommendation are no longer pertinent. Indeed, as noted above, his unit team at FCC Coleman notified the regional designator that their recommendation for transfer was to place Laken in Yankton. I note that P.S. 5100.07, Chapter 10, p. 4 states "Redesignation of an inmate should generally result in a move closer to an inmate's release destination" and "redesignations should be made without regard to regional boundaries." I ask you to follow this dictate.

<u>Laken's Placement at a "Secure" Camp was Arbitrary and Capricious</u>

<u>Security Enhancement based on inaccurate record</u>—As noted previously, Laken was transferred to FPC Atlanta because it was deemed necessary for security reasons. Due to a fundamental mis-reading or mis-interpretation of his Presentence Report, he has been placed in a "secure" minimum security camp.[5] His Atlanta placement was further based on the regional designator's subjective analysis, an analysis it seems that was driven by intuition and clearly capricious. Allow me to explain:

Lisa Sunderman, Reg. Gen. Coun.
July 28, 2004
Page five

---

[5] I have recommended to Laken, that should he be denied a transfer he should exhaust his administrative appeals and file suit under the Privacy Act demonstrating that the BOP willfully transferred him pursuant an inaccurate prison record citing the 11th Circuit Court of Appeals decision in <u>Perry v. Bureau of Prisons</u> (June 3, 2004) and <u>Rose v. United States</u>, 905 F 2d 1257, 1259 (9th Cir. 1990); or, in the alternative, file a *Bivens Action* naming designator Lane and director Holt as defendants.

Presentence Report:[6] ——Please allow me to quote from Probation Office Kapitansky's April 19, 2004 letter to FCC Coleman:

"Upon review of the presentence investigation report, we determined that there was no information provided which should have been interpreted as Mr. Laken being an 'associate' of an organized crime family..........We have no information....that Glen Laken was involved in any acts of extortion, threats, or intimidation.... [In sum,] Laken operated the Trade Venture Fund and sought investors for this fund. Laken was involved in a scheme to pay secret kickbacks to individuals who would then find investments through union pension funds."

The conspiratorial behavior Laken was accused of was alleged to involve members of organized crime.  The trial record demonstrated however that Laken relied on a co-defendant (John M. Black, Jr.) to solicit investors.  Black introduced Laken to a third party (an unindicted co-conspirator named Pokross, mentioned in the addendum to Laken's PSR)[7] who promised to secure the investors who had access to the union pension funds in question.[7]  While these union investors were alleged to be members or associates of organized crime, Laken's involvement with them (and it is arguable whether he was knowingly involved with them at all) was tenuous.  In fact, he never met, spoke to or even heard of any of the alleged LCN members listed in his PSR. Furthermore, at trial, it was found that only one union (Local 400) was actually "LCN influenced" and no evidence was presented at trial that any bribe monies were paid to Local 400 after the time Laken allegedly joined the enterprise. (See PSR ¶ 67, formerly p. 50).

Designator's Assessment- In a conversation with Regional Designator K. Lane on June 2, 2004, I was told in no uncertain terms that Mr. Laken was "lucky" to have received a re-designation and that he was being sent to Atlanta because Ms. Lane felt he required an enhanced security protocol. He could not be sent to Eglin ("that's a privilege", I was told) and that "there is something about Mr. Laken that I am sensing and I plan to get to the bottom of it."  I have had Lisa Sunderman, Reg. Gen. Coun.
July 28, 2004
Page six

many previous encounters with Ms. Lane and she has always been the consummate professional. I have always found her to be on top of her game, knowledgeable, experienced, forthright, and when she is convinced she is making the right decision, intractable (as she should be). In this instance, however, in assessing Mr. Laken's (and FCC Coleman's) request he be sent to Yankton, she seemed to be applying an improper standard to the question. She made a personal judgment based on suspicion, and an admitted "gut-feeling."  No where in the Bureau's rules and regulations does it say that an administrator can read a record and decide an

---

[6] It is important to note that Regional Director Holt, in his letter to me on June 17, 2004, stated that "The Bureau also consulted the Assistant United States Attorney assigned to the underlying criminal matter. Through this contact, the Bureau learned inmate Laken has filed post-sentence requests for the court to modify his PSI or other issue a statement the Bureau indicating such for designation purposes. The court appears to have considered that [AUSA's] position that the evidence at trial proved his knowing involvement with organized crime associates and the court declined to grant the requested relief." In reality, Laken sent two communications to the court, post-sentencing, asking the court to address the question of whether he was directly involved with members of organized crime and whether he had committed any acts of violence. On the first issue, the court deferred making any finding at all and with regard to the second matter, Judge Pauley purposely did not rule citing the fact that Laken's case was on appeal.

[7] See PSR, ¶ 95, p. 22, "Black facilitated the union pension fund schemes by recruiting Glen B. Laken to the enterprise."

administrative issue based on intuition or a hunch. Moreover, the law requires that the record be accurately read and assessed. In this case, it was not. Indeed, it seems evident that the account of Mr. Laken's crimes were grossly misread and he was transferred inappropriately to a facility that can not accomodate his religious, programmatic, or familial needs. The situation must be addressed and remedied by your office.

Conclusion

In sum, I am asking that your office grant Mr. Laken's requested relief and permit his transfer to a camp with an RDAP (e.g., FPC Yankton), where he can meaningfully practice his religion and receive visits from my family. I further ask that the decision to transfer him be based on accurate information and not on an arbitrary perception that he poses a greater security risk than the average camp inmate. It is of paramount importance that Mr. Laken's central file be cleansed of all inaccurate information and impressions so that the mistakes already made (twice) in designating him, not recur.

I would be pleased to discuss this matter with you, personally, should you have any questions. I am available at the number above. Thank you for your time and consideration.

Sincerely,


Joel A. Sickler

cc: Glenn B. Laken, Reg. No. 12999-424

Regional Administrative Remedy Appeal No. 337315-R2
Part B - Response

This is in response to your Regional Administrative Remedy Appeal receipted September 10, 2004. You allege you are being denied a transfer to a different Minimum security facility. As relief, you request a transfer to Minimum security facility closer to your home.

An investigation reveals this issue has been addressed in Regional Administrative Remedy Appeal No. 343516-R1. However, you were designated to the United States Penitentiary, Satellite Camp, Atlanta, Georgia, on June 23, 2004. Therefore, you must remain at that facility for 18 months with clear conduct before you can be considered for a transfer. Additionally, you are not eligible for transfer to participate in the Residential Drug Abuse Program at this time and your religious needs can be met at your assigned facility.

Accordingly, your Regional Administrative Remedy Appeal is denied. If dissatisfied with this response, you may appeal to the Office of General Counsel, Bureau of Prisons, 320 First Street, NW, Washington, DC, 20534. Your appeal must be received in the Office of General Counsel within 30 calendar days from the date of this response.

_9/28/04_
Date

_____
Regional Director, SERO



PLAINTIFF'S EXHIBIT
6

**BP 11 Lakes, Glen, Reg. No. 12999-424, Case No. 337315-RI**

I appeal Director Holt's denial of my BP-10 wherein I respectfully asked the Reg. Dir. to review FCC Coleman's denial of my request to be transferred to a camp near my home in Illinois. My reasons for this request are: 1) to be placed in a camp that can accommodate my religious needs; 2) I have specific programming requirements and request placement in an RDAP facility; and, 3) I need to be closer to my family in Illinois. A directly-related issue that also requires review, is whether my designation to USP Atlanta-satellite camp was properly handled within the rules and regulations of P. S. 5100.07. I believe the decision to place me in a satellite camp was capricious and arbitrary. Atlanta satellite camp, by the Bureau's own admission, is a "secure" minimum security camp. My transfer to Atlanta was directed by the Reg. Designator who claimed that it was her "gut feeling" that I needed to be in a facility with enhanced security measures. The designator's assessment of my security needs was based on a misinterpretation of my Presentence Report (PSR) and her subjective, arbitrary judgment. My explanations are below.

Religious needs being denied— I am of the Jewish faith, I observe the Sabbath, eat a kosher diet and seek the opportunity for group worship in a *minyan* (requiring a group of 10 men). Atlanta satellite camp can not accommodate my needs as an observant Jew. The kosher diet is lacking in essential nutrients and the rabbi, present on one hour per week, does not engage in any meaningful pastoral counseling. Moreover, I am one of only three Jewish inmates on the compound and a *minyan* can not be obtained to properly observe the Sabbath. Without a *minyan*, no formal religious services or group worship opportunities are possible for me and the BOP is in violation of the Supreme Court's decision in O'Lone v. Estate of Shabazz as well as the Religious Freedom Restoration Act of 1993 (RFRA).

Programming requirements being unmet - While I am not within 36-months of release, I note that P.S. 5330.10 lists this criteria factor as a variable that is "ordinarily" considered when determining an inmate's eligibility to begin RDAP treatment. It does not specifically prevent an inmate from requesting an eligibility interview nor does it strictly prohibit an inmate from starting the program prior to the 36-month-from-release threshold. In light of the Supreme Court's ruling in Blakely v. Washington, I expect my sentence to be reduced within in the next several months. This sentence reduction will render me immediately eligible for RDAP participation. For that reason, I am requesting an early eligibility interview and transfer to a RDAP camp.

Facilitate Family Visits—I request transfer to an RDAP camp, preferably in the North Central Region, near my family in Chicago. I have a 71-year-old mother in failing health and a 19-year-old son residing in Chicago. My mother is too infirmed to travel to Georgia and my son, a university student, can not afford the time away from school to visit me in the Southeast.

Improper Security Issue—I was transferred to FPC Atlanta because it was deemed necessary for security reasons (see letter of Reg. Dir. Holt to my representative dated June 17, 2004 attached as Exhibit A). Due to a fundamental mis-reading of my Presentence Report, I have been selected for placement in a "secure" minimum security camp. As a consequence, my religious rights, and my institutional programming and family needs are being undermined, if not outright denied me. The decision to move me to a "secure" camp was based on a mis-interpretation and mis-reading of my PSR.[1] It was further based on the reg. designator's subjective analysis. Decisions of this kind can not be made based on an administrator's intuition or "gut feeling"; her decision was clearly arbitrary and capricious.

---

[1] If denied a transfer I will exhaust my administrative appeals and file suit under the Privacy Act. I have grounds to prove that the BOP willfully transferred me pursuant to inaccurate prison records citing the 11th Circuit Court of Appeals decision in Perry v. Bureau of Prisons (June 3, 2004) and Rose v. United States, 905 F 2d 1257, 1259 (9th Cir. 1990).





**Administrative Remedy No. 337315-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
in which you request a transfer to another minimum security
institution closer to your release residence.  In addition, you
claim a transfer to a camp in Illinois would accommodate your
religious needs and meet your programming needs, specifically
participation in the Residential Drug Treatment Program (RDAP).

Our review reveals the Warden and Regional Director adequately
responded to the issues you raised in your appeal.  The issue of
transfers is left to the discretion of the Warden and Regional
Director per Program Statement 5100.07, <u>Security Designation and
Custody Classification Manual</u>.  The Bureau of Prisons attempts to
designate inmates to facilities as close to their homes as
possible commensurate with their security needs.  Unfortunately,
due to overcrowding and individual inmate needs, this is not
always possible.  As indicated, staff will consider your request
for a nearer release transfer after serving 18 months in your
current facility with clear conduct.  This decision is consistent
with the Bureau's need to effectively manage the inmate
population and resources.  While we empathize with your family
situation, we find you are appropriately designated.

As noted in your response from the Regional Director, you are not
eligible to transfer to participate in RDAP at this time and your
religious needs can be met at your assigned facility.
Accordingly, your appeal is denied.

December 22, 2004
_____
Date

Harrell Watts, Administrator
National Inmate Appeals



U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

REQUEST FOR ADMINISTRATIVE REMEDY

343516-F1

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | LAKEN   GLENN  B. | 12999-424 | E-04 | ATLANTA PRISON CAMP |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A- INMATE REQUEST**    The Bureau of Prisons is maintaining erroneous information in its

files and records regarding me. Specifically, the BOP computer record/data reflects that I am an associate of two(2) La Costra Nostra families, the Colunbo and Bonnano families, that I am charged with the conspiracy to solicit the murder of a goverment informant to name just a few. These references described above are erroneous and preclude me from being designated in a camp facility other than a satellite camp. Under the Privacy Act, the BOP is required to obliterate the above erroneous information from its computer data base and file servers. Although the U.S.Probation Office has notified the BOP that the above information is erroneos a copy of which is attached, the BOP is yet to expunge, obliterate said erroneous informatio from its computer data base and files. I am requesting such an expungement and obliteration of the erroneous files by the BOP and its records and files forthworth.

| 7/17/04 | | SIGNATURE OF REQUESTER |
|---|---|---|
| DATE | | |

**Part B- RESPONSE**

JUL 19 200-

| DATE | | WARDEN OR REGIONAL DIRECTOR |
|---|---|---|

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

CASE NUMBER: 343516-F1

ORIGINAL: RETURN TO INMATE

CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

PLAINTIFF'S EXHIBIT G

| DATE | | 'S SIGNATURE (STAFF MEMBER) | BP-229(13) APRIL 1982 |
|---|---|---|---|

USP LVN

## PART B-RESPONSE TO ADMINISTRATION REMEDY NO. 343516-F1

Inmate Name: Laken, Glen                                   Reg. No. 12999-424

This is response to your Administrative Remedy received July 19, 2004, wherein you allege your Security Designation Data Form lists erroneous information. You state the erroneous data has precluded you from being designated to a regular minimum security facility. You request that the alleged erroneous information be expunged from your Security/Designation Data.

Program Statement 5100.07, Security Designation and Custody Classification Manual, states in part, that inmates will be designated and/or redesignated to institutions based on security criteria, inmate programming needs, and other correctional administrative factors.

An investigation of this matter revealed erroneous information was listed on your Security/Designation Data Form (BP-337) based on information provided by the United States Probation Office (USPO). Your consultation with the USPO resulted in clarification of the erroneous information. However, the data included on the BP-337 cannot be changed once an individual has arrived at his designated facility. Annually or as required, your Male Custody Classification Form (BP-338) is updated to reflect current programming or security needs. Please note the information contained on the BP-337 does not reflect on the BP-338. The Bureau of Prisons has properly considered the initial designation and subsequent redesignation and will continue to monitor your placement throughout your incarceration.

Therefore, your Request for Administrative Remedy is partially granted. If dissatisfied with this response, you may submit an appeal on the appropriate form (Regional Administrative Remedy Appeal/BP-10) within 20 calendar days of the date of this response to the Southeast Regional Director, 3800 Camp Creek Parkway, SW, Building 2000, Atlanta, Georgia, 30331-6226.

G. Maldonado, Jr.                                          Date 7/28/04
Warden


PLAINTIFF'S
EXHIBIT
10

**BP-10**
**Administrative Remedy No. 343516-F1**
**Glen B. Laken, Reg. No. 12999-424**

I appeal the warden's decision to <u>not</u> correct erroneous information on my Security/Designation Data Form (BP-337).[1] Warden Maldonado, in denying my respect, reinforced "data included on the BP-337 cannot be changed once an individual has arrived at his designated facility." First, I find nothing in P.S. 5100.07 that prevents a defective BP-337 from being corrected after an inmate has arrived at an institution. Please show me the authority that Warden Maldonado is basing his decision on. Secondly, my faulty BP-337 resulted in my initial assignment to an institution where I didn't belong, and it has again (upon re-designation) resulted, unnecessarily, in my placement at a "secure camp." Allow me to explain this second point.

I was initially designated to FCC Coleman-Low due to a fundamental mis-reading or mis-interpretation of my Presentence Report. The erroneous information that resulted in this mistake was, I thought, clarified by the United States Probation Officer who prepared my PSR. Upon receiving this clarification, my unit team adjusted my security rating to "Minimum Out" and the team requested that the southeast region transfer me to a camp. Thereafter, I was informed that I had been assigned to the Federal Prison Camp at Atlanta, Georgia. I was told that I <u>must</u> be sent to a "secure" satellite camp due to my offense conduct. In a conversation with Regional Designator K. Lane on June 2, 2004, one of my legal representatives was told that I was being sent to Atlanta because of it's enhanced security protocol. Clearly, the regional designator made a security-related judgment using the same misinformation that led to my improper assignment to Low-security. The law requires that the BOP maintain accurate records and those records must be precisely read and assessed. More importantly, when a record is corrected those corrections must be made in a timely fashion and must include all inaccurate information. My BP-337 remains defective. My unit team at FCC Coleman, upon receipt of the USPO letter of clarification, notified region that I had been erroneously placed in an institution that did not match my security needs. My unit team sought my transfer. The region ultimately agreed and did in fact move me, but I was sent to a secure facility. I recognize that satellite camp Atlanta is a minimum security institution. However, Director Holt himself has labeled it a "secure camp." I do not require enhanced security measures and clearly, I was sent to Atlanta because the BOP continues to apply a extra security measure against me that are unnecessary. It seems evident that the chronicle of my crimes were grossly misread and I was transferred inappropriately to a facility that can not accommodate my religious, programmatic, or familial needs. The situation must be addressed and remedied by your office.

Respectfully, Glenn B. Laken.

---

[1] Please note that I have a pending BP-10 (Ad. Rem. No. 337315-F1) challenging the warden's decision at FCC Coleman that rejected my request to be transferred to an RDAP camp closer to my home in Illinois, where my religious needs can be accommodated. For security reasons, I was transferred to FPC Atlanta (a "secure minimum security camp" according to Dir. Holt). This admin appeal raises a different issue and while tangentially related to my transfer request, should be considered on it's own merits.



U.S. Department of Justice

Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

| From: | LAKEN, GLEN B. | 12999-424 | A-11 | FPC-ATLANTA |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL**

\*\*\*\*\*SEE ATTACHED\*\*\*\*\*

_10/18/04_
DATE

_[signature]_
SIGNATURE OF REQUESTOR

**Part B—RESPONSE**

---

DATE

ORIGINAL: RETURN TO INMATE

2 7 2004

GENERAL COUNSEL

CASE NUMBER: _343515-A_

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

---

DATE

PLAINTIFF'S EXHIBIT

T OF CENTRAL OFFICE APPEAL

BP-DIR-11
April 1982

**BP-11**
**Administrative Remedy No. 343515-R1**
**Glen B. Laken, Reg. No. 12999-424**

I appeal the Regional Director's decision to deny my request for a transfer to an institution that offers me the right to observe my faith.[1] This is a constitutional issue and must be remedied immediately. Prior to my incarceration, I observantly practiced my faith in Judaism. I prayed three times per day[2], recited the benedictions, honored the strictures of the Sabbath, obeyed Jewish dietary laws and read the Torah in a *minyan*. I can not adequately observe these rituals at FPC Atlanta. Director Holt noted in his BP-10 denial that I "may attend Jewish worship services that are scheduled at the appropriate times during the Sabbath." This is patently untrue. There are no Sabbath services offered at the Atlanta camp. Indeed, I was informed by my unit team that on Friday evenings I would be allowed to sit in the chapel, alone, to worship. That is not a resolution to the problem. Most Jewish prayers are expressed in the first person plural, "us" instead of "me," and are recited on behalf of all the Jewish people. This form of prayer emphasizes our responsibility for one another and our interlinked fates. In Judaism, prayer is largely a group activity rather than an individual activity. Although it is permissible to pray alone and it fulfills the obligation to pray, you should generally make every effort to pray with a group, short of violating a commandment to do so. A complete formal prayer service cannot be conducted without a quorum of at least 10 adult Jewish men. Certain prayers and religious activities cannot be performed without a minyan. Indeed, we can not read the Torah aloud without a minyan. This need for a minyan has often helped to keep the Jewish community together in isolated areas. This could not be more true than here in prison. While the Rabbi is a good man and does visit briefly on occasion (not weekly), we cannot read the Torah together as it must be done in group prayer. Jewish men at FPC Atlanta have no prayer services, or blessings (berakhad), we can not participate in a festival[3] (as other religions have done here), and I have no way of knowing whether our kosher meals (common fare), cooked at the penitentiary, are prepared properly under the restrictions of Deuteronomy 14:3-21. And, while Director Holt believes the kosher diet menu is nutritious, I am certain it is not.

I have an inherent right to be able to practice my religion. By denying my transfer to a prison that can fulfill that right, the BOP is in violation of the Supreme Court's decision in O'Lone v. Estate of Shabazz as well as the Religious Freedom Restoration Act of 1993 (RFRA).[4] All prison camps are operated uniformly. Would it be too difficult to move me to camp where I can complete my sentence by atoning for my sins while drawing strength from my faith?   Respectfully, Glenn B. Laken.

---

[1] Please note that I have a pending BP-11 (Ad. Rem. No. 337315-R1) challenging the decision made by the warden at FCC Coleman (ostensibly on direction from the region) to reject a request by my unit team to transfer me to an RDAP camp closer to my home where my religious rights are protected. This administrative appeal raises a different issue and while tangentially related to my transfer request, should be considered on it's own merits.

[2] In the morning (shaharith), afternoon (minhah), and evening (maarib).

[3] Such as Passover, Pentecost, Tabernacles or the minor festivals of Hanukkah and Purim.

[4] Religious activity can be limited by a warden only when "necessary for the security or good order of the institution..." DOJ/BOP P.S. 5360.08. O'Lone, later refined by the RFRA, requires a balancing test: while it is permissible for the BOP to restrict or impede an inmate's access to group worship, it can do so only if it provides more information than just a blanket security concern for the denial, such as past documented incidences of security threats or legitimate predictions of probable security and safety dangers.

Regional Administrative Remedy Appeal No: 343516-R1
Part B - Response

This is in response to your Regional Administrative Remedy Appeal receipted
August 20, 2004. You allege information on your Security/Designation Data form is
incorrect and your request to correct it has been denied. As relief, you request your
Security/Designation Data form be corrected and that you be transferred.

Pursuant to Program Statement 5800.11, Inmate Central File, if an inmate is able to
provide information in support of a challenge to their PSI, unit staff have a duty to
investigate and take steps to correct any inaccuracies discovered. For example, if an
inmate challenges information in the PSI, staff should inform the appropriate United
States Probation Office (USPO) in writing of the disputed information, and request that
a written response be provided. However, USPO procedures do not allow for changes
or addendums to be made to the PSI after sentencing since it is a court document.

Our investigation reveals, as stated in the Warden's response, your Unit Team
forwarded a letter to the USPO in reference to your concerns. A response from the
USPO indicated your concerns were legitimate and clarification of information in your
PSI was provided. You were provided a copy of the USPO's letter and a copy is
maintained in your Central File. The Security/Designation Data form was completed on
February 4, 2004, and can't be corrected after the initial designation. Your transfer to a
Minimum Security facility was based on information contained in your central file and
not the Security/Designations Data form. Therefore, you are appropriately designated
to a Minimum Security facility and no further movement is required at this time.

Based on the above, your Regional Administrative Remedy Appeal is denied. If
dissatisfied with this response, you may appeal to the Office of General Counsel,
Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal
must be received in the Office of General Counsel within 30 calendar days from the
date of this response.

_9/17/04_
Date

_Fr: _____
Regional Director, SERO



**Administrative Remedy No. 343515-A1**
**Part B - Response**

You contend you are not able to adequately practice your faith at your current institution.  You request transfer to another facility.

Our review of this matter reveals that both the Warden and the Regional Director have adequately addressed your concerns. Program Statement 5360.08, <u>Religious Beliefs and Practices</u>, states that "the Bureau of Prisons provides inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution and the Bureau of Prisons."

Staff have worked closely with you to ensure you are able to adhere to the basic tenets of your faith.  A Rabbi frequently visits you and the Chaplains provide you materials, worship space and the opportunity to practice your faith.  Your religious dietary requirements are met by your approval to participate in the certified processed food component of the religious diet program, which is both religiously-compliant and nutritionally adequate.  Given this, transfer to another facility is not warranted.

Your appeal is denied.

_____January 5, 2005_____
Date

_____
Harrell Watts, Administrator
National Inmate Appeals

PLAINTIFF'S
EXHIBIT
14

**Joel A. Sickler**
**Criminologist**

*Justice Policy Solutions, P.C.*
**4312 City Lights Drive**
**Aliso Viejo, California 92656**
**(949) 305-0001-direct**
**(949) 305-0002-facsimile**

Tuesday, June 1, 2004

**Via Facsimile & Federal Express**                    **Confidential & Time**
**Sensitive**

Kathy Lane
Regional Administrator for Designations
Southeast Regional Office
U.S. Bureau of Prisons
3800 Camp Creek Parkway, S.W.
Building 2000
Atlanta, Georgia 30331-6226

**Re:   Laken, Glen B., Reg. No. 12999-424**
**(Pending Transfer from FCI Coleman-Low)**

Dear Ms. Lane:

I understand your office has already received several inquiries concerning Mr. Laken's
pending transfer and I do not wish to take up much more of your valuable time on the
matter. However, I must beg your indulgence on the subject one last time. I am very
familiar with Mr. Laken's case having assisted in preparing him for sentencing before
the U.S. District Court in New York. I firmly believe that he should be reassigned to a
minimum security camp closer to his family, or to a camp where he can participate in
the Bureau's residential drug abuse program (RDAP), and importantly, have the
opportunity to observe his faith as a religious Jew.

As you know, Mr. Laken was assigned to a Low security facility due to confusion over
the description of his case in his Presentence Report (PSR). It was thought that Laken
had ties to organized crime or had directly or indirectly participated in offense behavior
necessitating imprisonment in a controlled environment.[1] After the probation office in

---

[1]   Laken's classification file falsely noted that he was an organized crime associate and had
participated in a conspiracy to solicit murder. Neither allegation is true and both were specifically
addressed in a letter to Laken's case manager by Ross Kapitansky, U.S. Probation Officer, Southern
District of New York (212/805-5165), attached hereto. Laken, 50, is a non-violent offender with no prior
criminal history who participated in a securities fraud.



Kathy Lane, Administrator
June 1, 2004
Page 3

the Southern District of New York issued a clarification to the Bureau of Prisons,
Laken's unit team at FCI Coleman recommended him for transfer to a camp.[2]  It
appears that your office has assigned him to the minimum security camp at Atlanta,
Georgia.

While it is reassuring that Mr. Laken's central file now reflects an appropriate security
level, there is concern that he is being sent to a facility that ignores two key aspects of
his confinement. Laken's sentencing judge specifically recommended him for
placement at FPC Eglin so that he could avail himself of the RDAP and, importantly, so
that he would be housed with other observant Jews and be permitted access to Kosher
diet, Sabbath services and other faith-based opportunities. The federal prison camp at
Atlanta does not house an RDAP and will necessitate yet another transfer for Mr. Laken
in a short period when it is time for him to apply for the program. Additionally, FPC
Atlanta has very few inmates of the Jewish faith (if they have any at all). According to
Rabbi Menachem Katz, Director, Prison Programs, Aleph Institute, a *minyan* for Friday
Sabbath services has never occurred at the Atlanta camp and kosher diet, if available,
must be brought over from the USP ("not a good situation" according to Rabbi Katz).[3]
This will impose a significant religious hardship upon Mr. Laken.

---

[2]  Working from Inmate Load and Security Designation Form-Male (BP-337), Laken has no
detainers (0);  his offense is rated "High" (+5); he has no prior commitments (0); no escape history (0); no
history of violence (0); and, his pre-commitment status is "Voluntary Surrender" (-3). Thus, Laken's security
point total is + 2, yielding a "Minimum" security level. [Policy Statement 5100.07]

[3]  As you know, The Aleph Institute, a not-for-profit 501 (c) (3) religious organization, stands
alone as the foremost agency in the world today, serving the spiritual needs of incarcerated Jews and their
families.

Kathy Lane, Administrator
June 1, 2004
Page 3

Finally, I note that Mr. Laken's family resides primarily in the Chicago, Illinois, area.
Therefore, I would request placement at a North Central regional camp. However, I
understand that the North Central region is experiencing population pressures and that
may not be possible. Laken did initially ask the court to recommend his confinement in
Southeast region primarily because Eglin ran the most instructive RDAP in the
country.[4] The rational for the court's program recommendation is still valid, however, if
you believe a North Central camp, possibly FPC Yankton (SD), can accommodate Mr.
Laken, I would encourage you to facilitate the reassignment. I do understand FPC
Yankton is only now receiving a significant percentage of Jewish inmates and while
they are scheduled to have a rabbi on staff, a Sabbath *minyan* cannot be obtained
(kosher diet is available). While this would not be ideal for Mr. Laken, the Yankton
camp does offer RDAP, is significantly closer to Laken's family and will provide some
opportunity for him to observe his faith (unlike FPC Atlanta).

Ms. Lane, our client has already been confined at a facility that was not suitable for his
security level. Although the court allowed voluntarily surrender, he is now faced with a
Marshals bus transport, in shackles, to a new facility, and, then, down-the-road, he will
have to be moved again, to a third facility– if he is not reassigned to an RDAP camp at
this juncture. This has been very difficult on a 50-year old first offender who, until three
months ago had never experienced the degradations of incarceration. I realize that fact
alone is not your concern and will not guide you decision in this case. Yet, it seems
that sound correctional policy (not to mention the economy of the bureau's resources)
dictates that Glen Laken should be sent to a minimum security facility where he can
finally settle in, adjust to his surroundings, practice his faith, volunteer for and complete
the RDAP and finish his sentence without undo interruption.

If you can spare a moment, I will call you today to discuss this matter. And, I promise
the call will be a quick one. Thank you, sincerely, for your time and consideration.

**Sincerely,**

**Joel A. Sickler**

Enclosure

---

[4] Laken also had a business and home in Florida that has since been sold.